CONNIE A. HOLDER, as Special Adm'r of the Estate of Richard Holder, Deceased, Plaintiff-Appellant, v. JUDE CASELTON *et al.*, Defendants-Appellees.

Fourth District    No. 4—94—0744

Argued September 13, 1995.—Opinion filed October 31, 1995.

John T. Papa (argued), of Callis, Papa, Hale, Jensen, Jackstadt, Bailey & Halloran, of Granite City, for appellant.

Karen L. Kendall (argued) and Gary M. Peplow, both of Heyl, Royster, Voelker & Allen, of Peoria, and Kim Roger Luther, of Luther and Butler, P.C., of St. Louis, Missouri, for appellees.

JUSTICE STEIGMANN delivered the opinion of the court:

Plaintiff, Connie A. Holder, special administrator of the estate of Richard Holder (Holder), sued defendants, Jude Caselton, M.D., and Jose Parcon, M.D., for medical malpractice, alleging that defendants failed to diagnose and treat Holder's acute appendicitis and sepsis. In May 1994, a jury returned a verdict for defendants. Plaintiff appeals, arguing that (1) the jury verdict was against the manifest weight of the evidence; (2) defendants presented irrelevant and prejudicial testimony and argument which deprived plaintiff of a fair trial; (3) the trial court erred by (a) limiting testimony regarding the effects of a certain drug, and (b) improperly instructing the jury. We affirm.

## I. BACKGROUND

On June 23, 1991, Holder went to the emergency room at Boyd Hospital in Carrollton with a sudden onset of epigastric pain. Dr. Caselton examined Holder and, believing he might have acute gastritis, gave him pain medication and told him to return if his pain did not subside. On June 25, 1991, Holder returned to the emergency room, complaining of right lower quadrant abdominal pain, lack of appetite, and slight nausea. Dr. Caselton examined Holder and found that he had diffused abdominal tenderness, mainly in the right lower quadrant. Dr. Caselton admitted Holder to the hospital and ordered lab tests, including a complete blood count and urinalysis. At that time, Holder was 6 feet 4 inches and weighed 344 pounds.

At admission, Holder's white blood cell count was elevated, and his urine was loaded with red blood cells. Holder had a long history of urinary tract problems, including dilated ureters, presence of uric acid stones, and passing of stones, as well as blood in his urine. He also had previously complained of pain in his right flank and right abdomen. On June 25, Dr. Caselton suspected urate calculi and uropathy and intended to observe Holder for acute abdomen with early acute appendicitis. After admitting Holder, Dr. Caselton instructed nurses to strain Holder's urine to monitor for blood and uric acid stones. During his entire hospital stay, Holder passed blood in his urine.

On June 26, 1991, Dr. Caselton asked Dr. Parcon, a general surgeon, to examine Holder. Dr. Parcon did so and found (among other determinations) that Holder showed signs of bowel function and had pain over both lower quadrants. An intravenous pyelogram (IVP) performed that same day showed no complete obstruction of Holder's ureters; nonetheless, Holder's white blood count remained elevated. At the time he examined Holder, Dr. Parcon believed that Holder's abdomen did not require immediate exploratory surgery. Dr. Caselton concurred in Dr. Parcon's opinion.

On June 27, 1991, Dr. Caselton examined Holder and found no tenderness or rigidity in the abdomen. On June 28, Holder's white blood count was within normal limits. On June 29, Holder's white blood count was still within normal limits. Dr. Caselton thought that Holder seemed better and displayed bowel sounds and a soft, less tender abdomen. On June 29, nurses strained Holder's urine and found a "black prickly stone." Late in the evening on June 29, Holder began deteriorating, complaining of lower right quadrant pain, and voiding dark brown and stained urine. He also had decreased blood pressure.

During the morning of June 30, 1991, Holder complained of severe abdominal pain and had rapid respiration. During the afternoon of June 30, Holder denied any pain, and his blood pressure was in the low normal range. At this time, Dr. Caselton thought Holder had renal colic and a decompressing belly that was "throwing off" pulmonary emboli. On July 1, 1991, Dr. Caselton, believing that Holder required the care of a specialist, ordered Holder transferred from Boyd Hospital to Passavant Hospital in Jacksonville. Holder died en route, and an autopsy revealed that his cause of death was peritonitis from a bacterial infection caused by a ruptured acute appendix.

## II. ANALYSIS

### A. *Plaintiff's Claim that the Verdict Was Against the Manifest Weight of the Evidence*

Plaintiff first argues that the jury verdict was against the manifest weight of the evidence because plaintiff showed that

defendants violated the appropriate standard of care by failing to diagnose and treat Holder's acute appendicitis and sepsis. Plaintiff cites the testimony of Dr. Miedema, one of her experts, that when a patient presents with abdominal pain "out of the blue," a physician must rule out acute appendicitis.

To prove negligence in a medical malpractice case, a plaintiff must show that the treatment received deviated from the appropriate standard of care. (*Witherell v. Weimer* (1987), 118 Ill. 2d 321, 333, 515 N.E.2d 68, 74.) In order for a verdict to be against the manifest weight of the evidence where the evidence is conflicting, an opposite conclusion must be clearly evident. *Flynn v. Edmonds* (1992), 236 Ill. App. 3d 770, 794, 602 N.E.2d 880, 895.

Plaintiff claims that no credible expert testimony contradicted her evidence that defendants violated the standard of care by failing to rule out acute appendicitis, and she cites *Carman v. Dippold* (1978), 63 Ill. App. 3d 419, 379 N.E.2d 1365, as supporting her claim. We disagree.

In *Carman*, the defendant doctor did not use or have forceps available during a breech delivery. (*Carman*, 63 Ill. App. 3d at 424, 379 N.E.2d at 1368.) All the doctors who testified in *Carman* said that forceps should have been on the instrument tray and used if other procedures were unsuccessful. (*Carman*, 63 Ill. App. 3d at 424, 379 N.E.2d at 1368.) The defendant in *Carman* presented no expert testimony in support of his continued use of an alternative procedure during the delivery. *Carman*, 63 Ill. App. 3d at 427, 379 N.E.2d at 1370.

Unlike *Carman*, defendants in the present case did offer expert testimony that supported their actions and contradicted plaintiff's claim that their conduct deviated from the appropriate standard of care. Dr. Burch, one of defendants' experts, testified that it was very reasonable for Dr. Caselton to assume that Holder's problem was urological in nature and that Dr. Caselton acted appropriately in not diagnosing acute appendicitis. Dr. Burch also stated that Holder's elevated white blood count on June 30, 1991, did not necessarily discount the presence of renal colic, and Holder could have developed an infection in his ureter.

Dr. Petrovich, another defense expert, testified that Dr. Caselton met acceptable medical standards in his care and treatment of Holder and that Dr. Caselton's failure to diagnose acute appendicitis was reasonable and within acceptable medical standards. Dr. Petrovich stated that there is no one test to detect appendicitis, and the coexistence of urinary tract disease and appendicitis makes diagnosis "extraordinarily difficult."

Dr. Wilson, a physician who had previously treated Holder, testified that Holder complained of pain in his right flank and right abdomen in 1983. Dr. Wilson also stated that it would have been negligent to operate on a patient with right lower quadrant pain and blood in his urine without first doing a urologic evaluation.

Dr. Schaeffer, an expert for Dr. Parcon, testified that Dr. Parcon conformed to the usual standards of care in treating Holder. Dr. Schaeffer also stated that Holder did not have an acute surgical abdomen at the time Dr. Parcon examined him and that Dr. Parcon did not have an obligation to see Holder again unless asked by Dr. Caselton.

Dr. Schwer, one of plaintiff's experts, acknowledged on cross-examination that acute appendicitis can be a very difficult diagnosis and that Holder did not have an abdomen that required emergency surgery at the time of Dr. Parcon's examination. Dr. Schwer also stated that blood in the urine is not the usual symptom of acute appendicitis.

Dr. Miedema, another expert for plaintiff, testified on cross-examination that there are times when the ultimate diagnosis is not made and no malpractice has occurred. Dr. Miedema stated that a physical examination, the most important exam in diagnosing appendicitis, would be difficult in Holder's case because of morbid obesity, and that debris and blood in the urine are not usually symptoms of appendicitis.

The jury in this case heard conflicting testimony as to whether the defendants violated the appropriate standard of care by failing to diagnose and treat Holder for acute appendicitis and sepsis. The jury found for defendants, and this court "should not usurp the function of the jury and substitute its judgment on questions of fact fairly submitted, tried, and determined from the evidence which did not greatly preponderate either way." (*Maple v. Gustafson* (1992), 151 Ill. 2d 445, 452-53, 603 N.E.2d 508, 512.) We hold that the jury verdict was not against the manifest weight of the evidence.

## B. *Trial Court's Limiting Testimony Concerning the Effects of a Drug*

Plaintiff next claims that the trial court abused its discretion by limiting certain testimony concerning the effects of Levoprome, one of the drugs administered to Holder during his hospitalization. Plaintiff claims that Dr. Parcon testified during re-cross that if he had examined Holder while he was under the maximum effect of Levoprome, his findings would not have been conclusive, and such an examination would have been a deviation from the standard of care

"as far as [Dr. Parcon is] concerned." Plaintiff argues that the court improperly limited the testimony of plaintiff's experts, Dr. Miedema and Dr. Schwer, regarding the pain-masking effects of Levoprome during physical examinations of Holder.

Defendants respond that plaintiffs have unfairly twisted Dr. Parcon's testimony, which was in response to a hypothetical situation that Dr. Parcon explicitly asserted did not exist. Although we agree with defendants' characterization, we need not address this issue further because plaintiff never made an offer of proof to demonstrate what the excluded testimony would have been.

When a party seeks to have a reviewing court determine whether the trial court's evidentiary rulings improperly restricted the examination of a witness, the record must be clear regarding what the witness' testimony would have been. (*Betts v. Manville Personal Injury Settlement Trust* (1992), 225 Ill. App. 3d 882, 909, 588 N.E.2d 1193, 1210-11.) In *People v. Land* (1993), 241 Ill. App. 3d 1066, 1086, 609 N.E.2d 1010, 1024, this court elaborated on this point, as follows:

"[O]ffers of proof are designed to eliminate such speculation and not only to give the trial court the opportunity to better understand the nature of the proffered evidence—and thereby reevaluate its prior ruling—but also to give courts of review the opportunity to see precisely the nature of the evidence the appellant complains the trial court improperly excluded."

Counsel makes an adequate offer of proof if she informs the trial court, with particularity, of the substance of the witness' anticipated answer. (*People v. McMillan* (1993), 239 Ill. App. 3d 467, 489, 607 N.E.2d 585, 601.) In *People v. Andrews* (1992), 146 Ill. 2d 413, 421, 588 N.E.2d 1126, 1131, the court held that "[a]n offer of proof that merely summarizes the witness' testimony in a conclusory manner is inadequate." The failure to make an adequate offer of proof waives the issue on appeal. *Andrews*, 146 Ill. 2d at 422, 588 N.E.2d at 1132; *Betts*, 225 Ill. App. 3d at 909, 588 N.E.2d at 1211.

When Dr. Miedema testified, defendants objected to his statements that Holder's painkilling medications would alter his physical examination. The trial court sustained the objection, and during the ensuing discussion between the court and counsel, plaintiff referred to Dr. Miedema's opinion in his deposition that it would not be appropriate to give analgesics to a patient until a diagnosis of appendicitis has been ruled out. However, plaintiff never attempted to make an offer of proof to demonstrate how Dr. Miedema would testify in response to questions specifically related to Levoprome and its pain-masking effects during Dr. Parcon's examination of Holder. At best, plaintiff merely alluded to what Dr. Miedema's testimony might be regarding the effects of analgesics in general.

Before Dr. Schwer testified, the trial court granted defendants' motion *in limine* prohibiting him from discussing Levoprome. Again, plaintiff never made an offer of proof detailing how Dr. Schwer would respond to questions about the pain-masking effects of Levoprome on Holder.

■ Because plaintiff failed to make adequate offers of proof at trial, this court cannot know the exact nature of the evidence plaintiff claims the trial court erroneously excluded. We decline to speculate what such offers of proof might have revealed. Accordingly, we have no basis upon which to conclude that the trial court erred in depriving the plaintiff of the opportunity to show the jury that Levoprome masked Holder's pain during any of the physical examinations.

### C. *Defendants' Presentation of Allegedly Irrelevant and Prejudicial Testimony and Argument*

Plaintiff next claims that certain testimony and argument defendants presented during trial constitute reversible error. She contends that defendants improperly wove a theme throughout the trial that for 20 years, defendants had been the only doctors serving the community of Carrollton (in which the trial took place). Plaintiff specifically cites the following: (1) comments in Dr. Caselton's opening statement regarding the length of time he had served the community; (2) comments in Dr. Parcon's opening statement regarding how he came to practice in Carrollton; (3) Dr. Parcon's testimony regarding his recruitment to work in the community; (4) Dr. Caselton's testimony regarding his past work experience, the reasons he and Dr. Parcon were the only physicians in the community, and how Holder's children screamed at him that he killed their father when he visited the funeral home; (5) questions to plaintiff's experts regarding whether they had seen Dr. Caselton's home across the street from the hospital; (6) various prejudicial questions asked of Dr. Schwer; and (7) various prejudicial comments during the closing arguments for both defendants.

The problem with plaintiff's argument is that she did not make a timely objection to the great majority of the allegedly improper testimony and argument. Plaintiff did not object (1) during either opening statement, (2) during Dr. Parcon's "rehabilitation" testimony, (3) during Dr. Caselton's testimony, or (4) when defendants' counsel asked plaintiff's experts whether they had seen Dr. Caselton's home across the street from the hospital.

To preserve an issue for appellate review, a party must make a timely objection. (*People v. Walton* (1990), 199 Ill. App. 3d 341, 345, 556 N.E.2d 892, 895.) Generally, timeliness requires that objections

to evidence be made at the time the evidence is offered. *Hunter v. Chicago & North Western Transportation Co.* (1990), 200 Ill. App. 3d 458, 472, 558 N.E.2d 216, 225.

■ Plaintiff argues that she preserved for review any claims of error during the "rehabilitation" testimony of Dr. Caselton by virtue of her motion to strike his entire testimony. However, plaintiff made that motion only after defendants had completed their examination and plaintiff had completed her redirect examination. A motion to strike after the evidence has been received does not constitute a timely objection. (*Hunter*, 200 Ill. App. 3d at 472, 558 N.E.2d at 225.) Because plaintiff's motion to strike Dr. Caselton's testimony was untimely, we hold that she has waived this matter on appeal. See *Golden v. Kishwaukee Community Health Services Center, Inc.* (1994), 269 Ill. App. 3d 37, 49, 645 N.E.2d 319, 328.

Plaintiff also claims that two questions defendants asked of Dr. Schwer constitute reversible error even though plaintiff's counsel made timely objections, which the trial court sustained. The first question was asked in the context of Dr. Schwer's testimony that even though 30% to 40% of patients operated on for appendicitis have a normal appendix, such surgeries are not unnecessary. Defendants then asked the following: "I guess surgeons can make a lot more money doing surgery on four out of ten people that don't need it?" The trial court sustained the objection and instructed the jury to disregard the comment. The second question occurred when defendants asked Dr. Schwer if he was aware that his criticism of defendants could affect their reputations. The trial court sustained plaintiff's objection and instructed the jury to disregard the remark.

In support of her argument on this point, plaintiff relies on *Torrez v. Raag* (1976), 43 Ill. App. 3d 779, 782, 357 N.E.2d 632, 634, where the defense counsel stated the following during closing argument: " 'I am concerned though, and I am seriously concerned, because this man's right to practice medicine by reason of this lawsuit—.' " Counsel in *Torrez* was then interrupted by an objection, which the trial court sustained. The trial court subsequently set aside the jury's verdict for the defendant, citing as one of its reasons the arguments of counsel. The appellate court in *Torrez* upheld the trial court's decision to grant a new trial, noting that the trial court is in a superior position to gauge the possible prejudicial effect of an improper closing argument.

Our examination of this record reveals that the first question asked of Dr. Schwer has no connection to the comments made in *Torrez*. Further, an examination of the second question in context reveals that it was merely part of legitimate impeachment. The record shows that context as follows:

958

"[Defense counsel]: Now, today, if I heard you correctly, you had another opinion that I don't see in that letter, the letter the attorney wrote you...

DR. SCHWER: Correct. I said that [a barium enema] is what was normally done, yes.

[Defense counsel]: Well, you said Dr. Parcon should have done that, didn't you?

DR. SCHWER: I think he should have done that, yes.

[Defense counsel]: That's nowhere in the letter[,] is it?

DR. SCHWER: No. We are talking about a letter that is three months before my deposition. I responded to questions phrased in a certain way.

[Defense counsel]: Doctor, that letter was written at a time when you knew that you might be called into a courtroom in front of jurors to accuse physicians of malpractice, you knew that, didn't you?

DR. SCHWER: Yes.

[Defense counsel]: And you knew that was serious, didn't you?

DR. SCHWER: Of course it's serious.

[Defense counsel]: And you knew that it could affect the reputation of these physicians who you were going to criticize, didn't you?"

■ Defendants assert that the purpose of these questions was to impeach the credibility of Dr. Schwer regarding his testimony criticizing Dr. Parcon, which was not contained in Dr. Schwer's original opinion letter. We agree and view this situation as being far different from that in *Torrez*.

Plaintiff also claims that certain testimony of Dr. Caselton constitutes reversible error because defendants' line of questioning was intended to improperly sway the attitudes of jurors. That testimony occurred when defense counsel asked Dr. Caselton what happened when he arrived at the funeral home, and plaintiff's counsel objected on relevancy grounds. The trial court overruled the objection, and Dr. Caselton stated that when he approached the casket, Holder's daughter screamed, "[y]ou killed my dad."

■ The admission of evidence lies within the sound discretion of the trial court, and a reviewing court will not reverse unless that discretion has been clearly abused. (*Gill v. Foster* (1993), 157 Ill. 2d 304, 312-13, 626 N.E.2d 190, 194.) We hold that the trial court did not abuse its discretion in allowing the complained-of testimony of Dr. Caselton. We further view plaintiff's claims regarding the alleged prejudicial effect of this testimony as vastly overstated.

Plaintiff further claims that even if she did not properly preserve for review claims of error by making timely objections, these claims

constitute plain error because they were so prejudicial that they deprived her of a fair trial and substantially impaired the integrity of the judicial process itself. She asserts that defendants' "hometown" doctor theme, interjected into the trial most notably during opening statements, along with defendants' "rehabilitation" testimony and closing arguments, denied her a fair trial.

In *Belfield v. Coop* (1956), 8 Ill. 2d 293, 313, 134 N.E.2d 249, 259, the supreme court held that the plain error doctrine can be applied in civil cases and explained as follows:

> "If prejudicial arguments are made without objection of counsel or interference of the trial court to the extent that the parties litigant cannot receive a fair trial and the judicial process stand without deterioration, then upon review this court may consider such assignments of error, even though no objection was made and no ruling made or preserved thereon."

This court has held that because civil trials do not implicate sixth amendment concerns, the "application of the plain error doctrine to civil cases should be exceedingly rare and limited to circumstances amounting to an affront to the judicial process." (*Allison v. Stalter* (1993), 251 Ill. App. 3d 127, 131, 621 N.E.2d 977, 979.) In *Gillespie v. Chrysler Motors Corp.* (1990), 135 Ill. 2d 363, 377, 553 N.E.2d 291, 298, the court wrote that the cases in which it had applied the *Belfield* standard and granted a new trial "involved blatant mischaracterizations of fact, character assassination, or base appeals to emotion and prejudice."

■ We conclude that the testimony and arguments portraying defendants as longtime hometown doctors do not meet the stringent standards set forth in *Belfield, Gillespie,* and *Allison.* The testimony and comments here do not constitute plain error.

## D. *Jury Instructions*

Plaintiff last argues that the trial court improperly instructed the jury by giving the "short form" of Illinois Pattern Jury Instructions, Civil, No. 15.01 (2d ed. 1971), as opposed to its "long form." However, we hold that plaintiff waived this argument.

The record of the jury instruction conference does not contain any discussion regarding these instructions. Defendants assert that plaintiff raises this issue for the first time on appeal, and plaintiff appears to concede that point in her reply brief by failing to respond or point out where the record contains any objection she made at the trial level.

■ To preserve an objection to a jury instruction, a party must both specify the defect claimed and tender a correct instruction.

(*Deal v. Byford* (1989), 127 Ill. 2d 192, 202-03, 537 N.E.2d 267, 271.) A party's failure to make a proper record regarding a jury instruction waives the issue on appeal. (*Tierney v. Community Memorial General Hospital* (1994), 268 Ill. App. 3d 1050, 1062, 645 N.E.2d 284, 292.) Plaintiff's failure to make a proper record has waived this issue on appeal.

## III. CONCLUSION

For the reasons stated, we affirm the trial court's judgment.

Affirmed.

KNECHT, P.J., and COOK, J., concur.