LINDA VAN WINKLE, Indiv. and as Special Adm'r of the Estate of Donald Van Winkle, Deceased, Plaintiff-Appellee and Cross-Appellant, v. OWENS-CORNING FIBERGLAS CORPORATION, Defendant-Appellant and Cross-Appellee (Illinois Central Railroad Company, Defendant).—MARK HICKS, as Special Adm'r of the Estate of Thelma Hicks, Deceased, *et al.*, Plaintiffs-Appellees and Cross-Appellants, v. OWENS-CORNING FIBERGLAS CORPORATION, Defendant-Appellant and Cross-Appellee (Illinois Central Railroad Company, Defendant).

Fourth District   Nos. 4—96—0382, 4—96—0383 cons.

Argued February 19, 1997.—Opinion filed August 14, 1997.

McCULLOUGH, J., dissenting.

Timothy S. Bishop and Jeffrey W. Sarles, both of Mayer, Brown & Platt, of Chicago, and Andrew L. Frey (argued), of Mayer, Brown & Platt, of New York, New York, for appellant.

James Wylder (argued) and James Walker, both of James Walker, Ltd., of Bloomington, for appellees.

PRESIDING JUSTICE STEIGMANN delivered the opinion of the court:

In March 1995, plaintiff Linda Van Winkle, individually and as special administrator of the estate of Donald Van Winkle (Van Winkle), sued defendant, Owens-Corning Fiberglas Corporation (OCF), alleging OCF conspired with one or more other manufacturers of asbestos products (John-Mansville Corporation (J-M), Union Asbestos and Rubber Company (Unarco), and Raybestos-Manhattan, Inc. (Raybestos)), to suppress and not warn of the health hazards of asbestos exposure, thereby causing harm to Van Winkle. In October 1995, plaintiffs Mark Hicks (Mark), as special administrator of the estate of Thelma Hicks (Hicks), and Coleman Hicks, Jr. (Coleman), filed an amended complaint against OCF alleging a similar conspiracy which caused Hicks' death. The trial court consolidated the cases for trial, and in November 1995, a jury returned a verdict for plaintiffs and against OCF. The jury awarded compensatory damages of $1.1 million to the Hickses and $2.7 million to the Van Winkles. The jury also awarded $500,000 in punitive damages to the Van Winkles.

OCF appeals, arguing that the trial court erred by (1) failing to respond adequately to a question the jury raised during deliberations; (2) taking judicial notice of certain facts; (3) excluding certain testimony; (4) refusing to allow certain exhibits to go to the jury; (5) refusing to give defendant's special interrogatories; and (6) giving plaintiffs' nonpattern instructions to the jury. OCF also argues (1) OCF cannot be held liable unless it joined the conspiracy before the occurrence of acts that caused Van Winkle's and Hicks' injuries because late-joining conspirators are not liable for prior acts of coconspirators; and (2) the evidence was insufficient to show a conspiracy.

Because we agree with OCF's first argument—namely, that the trial court erred in its response to the jury's question—we reverse and remand for a new trial.

## I. BACKGROUND

Van Winkle worked from June 1959 until November 1959 at a Bloomington, Illinois, asbestos plant then owned by Unarco. It is undisputed that (1) during 1959, asbestos fibers were released into the air at the plant; (2) some of those fibers came from products manufactured by J-M; and (3) Van Winkle developed mesothelioma as a result of his exposure to asbestos at the Unarco plant. Coleman worked at the Unarco plant from January 1953 until September 1961. Hicks was exposed to asbestos fibers that Coleman brought

home from the Unarco plant on his clothing and person; as a result of her exposure, Hicks developed mesothelioma, which caused her death in August 1995.

### A. Events (Not Involving OCF) Occurring Prior to Decedents' Last Exposure

Much of the evidence presented at trial related to events that took place prior to Van Winkle's and Hicks' last exposures to asbestos, in November 1959 and September 1961, respectively. Some of that evidence related to events in which OCF was not involved, as follows. Dr. Barry Castleman, plaintiff's expert, testified that (1) during the 1930s and 1940s, J-M and Raybestos attempted to suppress asbestos research conducted by Saranac Laboratory (Saranac); and (2) during the 1930s, J-M and Raybestos tried to prevent Asbestos magazine from publishing information regarding asbestosis. In 1936, Saranac, J-M, Raybestos, Unarco, and other companies (not including OCF, which did not exist until 1938) reached an agreement that the companies would retain control over asbestos research they funded, including publication decisions. In 1950, the Quebec Asbestos Mining Association (of which OCF was not a member) withdrew its funding for asbestos cancer studies. In the mid-1950s, the Asbestos Textile Institute (of which OCF was not a member) refused to fund cancer studies.

### B. Events (Involving OCF) Occurring Prior to Decedents' Last Exposure

Some preexposure evidence related to events involving OCF but not Raybestos, J-M, or Unarco. OCF internal memoranda dated February 1939 and July 1966 indicated an OCF policy of referring all inquiries regarding health matters to its legal department.

Dr. Jon Konzen, a former medical director of OCF, testified that by January 1942, OCF executives knew that airborne asbestos can cause asbestosis. In a January 1942 internal memorandum detailing OCF's strategy for 1942, an OCF employee proposed collecting articles identifying asbestos as a cause of asbestosis as a "weapon-in-reserve," for possible use in negotiations with the Asbestos Workers' Union.

In 1953, OCF began distributing Kaylo, an asbestos-containing product manufactured by Owens-Illinois. In October 1956, OCF and Owens-Illinois produced a brochure advertising Kaylo that described Kaylo as "nontoxic." In September 1959, OCF produced a similar brochure under its own name also describing Kaylo as "nontoxic." Konzen testified that OCF superiors knew the statement regarding Kaylo's toxicity was false.

## C. Events (Involving OCF) Occurring After Decedents' Last Exposure

In 1964, J-M's medical director informed F.H. Edwards, an OCF employee, that J-M planned to place warnings on its shipping containers as of October 1964 but not on the products themselves. In August 1964, Edwards sent an internal memo to OCF's chief legal counsel, asking whether OCF should "follow the J-M lead" to protect itself from increasingly stringent health laws and third-party actions. OCF began labeling its own shipping containers in 1966. In a November 1965 internal memo, Edwards suggested OCF should find a way to prevent Dr. Selikoff (a physician who was attempting to publicize the health effects of asbestos) from affecting OCF's sales. Edwards also noted his "surprise and suspicions" about certain recent statements made by J-M's medical director.

In the late 1960s, an OCF employee and a J-M employee drafted a pamphlet for the National Manufacturers Association (NMA) (an organization to which OCF and Konzen belonged) regarding recommended health safety practices for handling asbestos-containing products. The pamphlet described asbestos as "potentially injurious." However, the pamphlet mentioned nothing about the dangers of breathing asbestos dust or that overexposure could occur without immediate symptoms. According to Castleman, minutes of a meeting of a November 1988 cement manufacturers' association (of which OCF was not a member) showed the pamphlet was published "with avoidance of liability in mind" and was not "intended *** to inform the workers *** about the hazards." Castleman also testified that the 1966 pamphlet is "probably the strongest evidence" OCF participated in the alleged conspiracy.

In April 1968, Konzen received an internal memorandum from OCF employee John Vyverberg, regarding a "position paper on fibrous glass," which attached a J-M report describing asbestos health dangers and asked Konzen's view about whether it would be "wise from a liability protection point of view [for OCF] to indicate that there might be 'potential hazards.' " That memo also indicated OCF's approach to date had been to indicate that " 'all medical research to date indicates no hazard to health.' " In March 1970, Konzen advised Vyverberg not to attend an asbestos disease conference because it would be a "giant propaganda exercise" and would give "tacit approval to Selikoff."

A July 1968 internal memorandum informed OCF "top management" that Vyverberg had indicated "much care and consideration" went into developing the constitution and bylaws of the Insulation Industry Hygiene Council (the memo called it Selikoff's "brainchild").

The memo noted that the strategy was an attempt to "limit the influence of Dr. Selikoff" and avoid "clinical study of insulation workers" within the council.

In April 1970, OCF purchased the Bloomington Unarco plant. Within two weeks after its purchase, Konzen reviewed the potential health hazards within the plant. By July 1970, Konzen had received preliminary survey results. In an internal memorandum, Konzen stated: "This study demonstrates immediate need for inplant environmental control of asbestos so our employees do not continue to be severely exposed to airborne asbestos fiber." As a result of the industrial hygiene survey, Konzen suggested to OCF superiors that labeling should be done on asbestos products. In response, he received an internal memorandum from OCF employee J.P. Kern, which stated, "Are you saying that *we have* to do this now? I naturally would like to delay this requirement as long as possible." (Emphasis in original.) Unarco knew of the dangers of asbestos but did not warn plant workers during its ownership of the plant. After purchasing the plant from Unarco, OCF did not inform plant workers of any asbestos hazards. This failure to inform continued during the entire time OCF used asbestos at the plant.

In 1972, an OCF plant manager requested information on asbestos to transmit to Japan. OCF responded by telling the manager that he was "probing into a very sensitive area." The internal memo also questioned how much information OCF wanted to release on the subject and forwarded the manager's request to OCF's legal department and Konzen.

In 1978, the Secretary of the United States Department of Health and Human Services publicly announced the risks associated with asbestos exposure. Konzen and other OCF employees then contacted eight other asbestos manufacturers (including J-M) to see how those companies had responded or planned to respond to the announcement. Konzen testified that OCF possessed the necessary medical knowledge to act in response to the announcement without contacting other companies. Konzen also stated that asbestos companies formed a tight-knit community, and it was common for their medical directors to talk with each other.

## II. OCF'S USE OF FOOTNOTES

■ Before addressing the merits, we address OCF's use of footnotes. Supreme Court Rule 341(a) provides that "[f]ootnotes, if any, shall be used sparingly." 155 Ill. 2d R. 341(a). In addition, Rule 344(b) discourages the use of footnotes in briefs. 155 Ill. 2d R. 344(b). OCF's brief contains 12 footnotes; its reply brief contains 18. All are

single spaced, and many contain substantive argument that should be presented in the body of the brief. This simply cannot be characterized as using footnotes "sparingly." We also note that OCF's reply brief is 27 pages long and probably would have violated the page limitation of Rule 341(a) had the 18 footnotes been integrated into the body of the brief. See 155 Ill. 2d R. 341(a) (page limitation for reply briefs, if not printed, is 27 pages). Using footnotes to circumvent the page limitation violates "the spirit, and probably *** the letter, of the law." *In re Estate of Marks*, 231 Ill. App. 3d 313, 320, 595 N.E.2d 717, 721 (1992).

Adherence to the page limitations and guidelines for footnote usage is not an inconsequential matter. *Lagen v. Balcor Co.*, 274 Ill. App. 3d 11, 14-15, 653 N.E.2d 968, 971 (1995). We agree with the *Lagen* court that "Rule 341 represents the Illinois Supreme Court's considered opinion of the format that best facilitates the clear and orderly presentation of arguments." *Lagen*, 274 Ill. App. 3d at 15, 653 N.E.2d at 971. In the future, this court may simply disregard footnotes when parties use them in violation of Rule 341(a). Of course, the best way for a party to ensure that we do not disregard some portion of its brief is to refrain from using any footnotes at all. Aside from limitations imposed by supreme court rules, omitting footnotes constitutes better—and more persuasive—writing. See S. Wilgenbusch, *Preparing Your Brief: Whether 'Tis Better to Footnote—Or Not*, 7 App. L. Rev. 39 (1996).

## III. THE TRIAL COURT'S RESPONSE TO THE JURY'S NOTE

OCF first argues that the trial court erred by failing to adequately respond to a question of law the jury raised during deliberations. We agree.

During deliberations, the jury sent out a written note which read as follows:

"Does a conspiracy *have* to be between [OCF] and another company, or can a conspiracy be within the same company ([OCF]) with the company officers conspiring among themselves?

We are confused about the meaning of 'one or more parties' in a conspiracy. Can this mean [OCF] alone, or does it have to be [OCF] and another company?" (Emphasis in original.)

The court asked OCF's counsel for a suggested response, and counsel stated, in relevant part, as follows: "Well, I would suggest to the [c]ourt that both questions would be easy to answer. The answer is obviously, yes, it has to be between OCF and another company as plead[ed]. You cannot conspire with yourself." Plaintiffs' counsel objected to this suggestion and suggested instead that the court respond that the instructions provided contain the applicable law. Af-

ter discussion with counsel, the court responded with a note, stating "[t]he instructions which the [c]ourt has provided contain the law applicable to these cases. Please refer to your instructions."

■ In *People v. Childs*, 159 Ill. 2d 217, 228-29, 636 N.E.2d 534, 539 (1994), the supreme court addressed a trial court's response to a jury question and wrote the following:

> "A trial court may exercise its discretion and properly decline to answer a jury's inquiries where the instructions are readily understandable and sufficiently explain the relevant law, where further instructions would serve no useful purpose or would potentially mislead the jury, when the jury's inquiry involves a question of fact, or if the giving of an answer would cause the court to express an opinion which would likely direct a verdict one way or another. [Citation.] However, jurors are entitled to have their inquiries answered. Thus, the general rule is that the trial court has a duty to provide instruction to the jury where it has posed an explicit question or requested clarification on a point of law arising from facts about which there is doubt or confusion. [Citation.] This is true even though the jury was properly instructed originally. [Citation.] When a jury makes explicit its difficulties, the court should resolve them with specificity and accuracy [citations]. *** The failure to answer or the giving of a response which provides no answer to the particular question of law posed has been held to be prejudicial error."

The supreme court viewed the question the jury submitted to the court in *Childs* as constituting "an explicit question which manifested juror confusion on a substantive legal issue." *Childs*, 159 Ill. 2d at 229, 636 N.E.2d at 540. In our opinion, the question asked here constituted the same thing. Although *Childs* was a criminal case, we deem that distinction irrelevant and hold that the supreme court's analysis in *Childs* applies fully to civil cases as well.

The jurors here asked an *explicit* question: "Does a conspiracy *have* to be between [OCF] and another company, or can a conspiracy be within the same company [(OCF)] with the company officers conspiring among themselves?" (Emphasis in original.) This question is no less explicit than the question asked in *Childs*, whether the defendant "could be found guilty of armed robbery and either voluntary or involuntary manslaughter, or if a finding of guilt of armed robbery mandated a 'guilty of murder' verdict." *Childs*, 159 Ill. 2d at 229, 636 N.E.2d at 540.

■ The jurors in this case *specifically* expressed their confusion regarding whether "one or more parties" in a conspiracy could mean OCF alone. Plaintiffs point out the court had earlier (and correctly) instructed the jury that—for a conspiracy to exist—OCF had to agree

with another company. Also, the issues instruction identified those other companies. However, as the court in *Childs* wrote, "[W]hether the instructions were proper *** is not the determinative inquiry. The issue is whether the instructions were clearly understandable to the jury." *Childs*, 159 Ill. 2d at 231, 636 N.E.2d at 540.

Further, the jury's question here involved a substantive legal issue—namely, the elements of a civil conspiracy. In *Adcock v. Brakegate, Ltd.*, 164 Ill. 2d 54, 62, 645 N.E.2d 888, 894 (1994), the supreme court held that a civil conspiracy consists of a combination of two or more persons or entities for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means. However, a civil conspiracy cannot exist between a corporation's own officers or employees. See *Salaymeh v. Interqual, Inc.*, 155 Ill. App. 3d 1040, 1044, 508 N.E.2d 1155, 1158 (1987); *Bonanno v. La Salle & Bureau County R.R. Co.*, 87 Ill. App. 3d 988, 995, 409 N.E.2d 481, 486 (1980). Accordingly, because the jury's question here constituted "an explicit question which manifested juror confusion on a substantive legal issue," we hold that the trial court abused its discretion in its response to the jury's written question—which was, in effect, no response at all.

Additionally, in our opinion, the jury's question of law concerned a potentially dispositive issue. Plaintiffs introduced into evidence several *internal* memoranda between OCF personnel in support of their claim that OCF conspired with other asbestos companies. OCF argued at trial that a conspiracy cannot exist when companies merely "acted similarly but independently of one another without agreement" and insufficient evidence existed to show that OCF had conspired with *other* asbestos companies. Thus, it was critical to OCF's defense that the jury understand that a conspiracy could not exist among OCF's officers. Given the considerable importance of this issue to OCF's defense, we conclude that the trial court's error in responding to the jury's question caused substantial prejudice to OCF and requires reversal.

In so concluding, we note that the better practice would have been for OCF's counsel to have provided the trial court with a written draft of the specific response counsel wanted the court to give the jury, just as counsel provides a written proposed instruction during the jury instruction conference. Supreme Court Rule 239(c) requires parties to submit proposed jury instructions in writing so that the record shows exactly the parties' respective positions on how the jury should be instructed. 134 Ill. 2d R. 239(c). We should require nothing less when the jury raises a question during deliberations, requiring the court to decide how to respond to—that is, to instruct—the jury.

Indeed, in the midst of jury deliberations after a vigorously contested trial, a question from the jury deserves as much—if not more—thoughtful consideration as did the original instructions. Accordingly, we hold that when jurors raise a question during deliberations, counsel must submit—in writing—the specific response counsel wants the court to give the jury. Because we are pronouncing a new rule, we believe it is only equitable that we apply it prospectively. See *Aleckson v. Village of Round Lake Park*, 176 Ill. 2d 82, 86, 679 N.E.2d 1224, 1226 (1997) (the issuing court itself may expressly state that its decision will be applied prospectively only); see also *Torres v. Walsh*, 98 Ill. 2d 338, 353, 456 N.E.2d 601, 608 (1983). We also note that, in the present case, OCF's counsel's failure to submit a written draft of OCF's proposed specific response to the jury's question does not constitute waiver because—in addition to the fact that, prior to this point, no case law or rule existed so requiring—the record shows (1) the court clearly understood OCF's suggestions; and (2) the jury's questions were so well stated that an appropriate response to the jury's note would have been the following:

> "The court has received your note in which you ask two questions: (1) [Jury's first question]; and (2) [Jury's second question]. The answer to your first question is 'the conspiracy has to be between OCF and another company,' and the answer to your second question is ' "one or more parties" in a conspiracy means OCF and another company.' "

## IV. ISSUES ON REMAND

OCF raises several other issues likely to arise on remand.

### A. Late Entry by Coconspirator

OCF argues that, even if sufficient evidence existed that it ultimately joined the alleged conspiracy, OCF still may not be held liable unless it joined *before* the acts which caused plaintiffs' injuries. OCF contends that a late-joining conspirator is not liable for any acts committed by coconspirators before it joins the conspiracy. In response, plaintiffs cite a statement appearing in Illinois Law and Practice that "every conspirator is liable for all of the acts of each of his co-conspirators done in furtherance of the objects of the conspiracy committed before or after his entry into the conspiracy." 11 Ill. L. & Prac. *Conspiracy* § 16, at 150 (1981). We do not agree with either contention.

■ Although we believe it unfair to hold a late-joining conspirator responsible for *all* prior acts of its coconspirators simply because it ultimately joined the ongoing civil conspiracy, it does *not* follow that a late-joining conspirator is *never* responsible for prior acts of its

coconspirators. In *Page v. Keeves*, 362 Ill. 64, 74, 199 N.E. 131, 135 (1935), the supreme court, considering a conspiracy to defraud an individual of her real estate, wrote the following:

> "Where one assists in the commission of a wrongful act against another, or *with knowledge approves of it after it is done*, if done for his benefit, and he avails himself of the fruits of such improper conduct, he is liable in the same manner as if he himself had committed the same wrongful act." (Emphasis added.)

Further, we find instructive the decision in *Havoco of America, Ltd. v. Shell Oil Co.*, 626 F.2d 549, 554 (7th Cir. 1980), in which the court wrote, "a co-conspirator who joins a conspiracy, *with knowledge of what has gone on before* and with an intent to pursue the same objectives" (emphasis added), may be held responsible for the prior acts of its coconspirators.

Consistent with the views expressed in *Page* and *Havoco*, we conclude that a party who, with *knowledge and approval* of the prior acts of its coconspirators, joins a preexisting civil conspiracy—by satisfying the elements of civil conspiracy as set forth in *Adcock*—is liable for those prior tortious acts of its coconspirators.

This conclusion is not inconsistent with the supreme court's decision in *Adcock*, which discussed the elements necessary to state a cause of action for conspiracy and held, in relevant part, as follows:

> "Once a defendant knowingly agrees with another to commit an unlawful act or a lawful act in an unlawful manner, that defendant may be held liable for any tortious act committed in furtherance of the conspiracy, whether such tortious act is intentional or negligent in nature." *Adcock*, 164 Ill. 2d at 64, 645 N.E.2d at 894-95.

The supreme court in *Adcock* did not address whether a late-joining conspirator may be liable for prior acts of its coconspirators.

In light of our conclusion that late-joining conspirators are liable for prior tortious acts only when it is proved they knew and approved of those prior acts, we hold that, on remand, to the extent plaintiffs allege that OCF joined the conspiracy after acts that caused Van Winkle's and Hicks' injuries, they must present evidence that OCF knew and approved of the prior acts of the other asbestos companies when it joined the conspiracy in order to prove OCF is responsible for those prior acts. On appeal, plaintiffs contend OCF joined the alleged conspiracy "at least by 1953." If plaintiffs so allege on remand, they must provide evidence that OCF knew and approved of the acts of the other asbestos companies during the 1930s and 1940s in order for OCF to be liable.

■ We also note that if the trial court, on remand, (1) finds suf-

ficient evidence that OCF joined the conspiracy, but (2) does not find sufficient evidence that OCF is responsible for the acts of its coconspirators prior to OCF's entry into the conspiracy, then evidence of those prior acts is still admissible for the limited purpose of showing the scope and nature of the conspiracy OCF joined. Under these circumstances, however, the court must instruct the jury that it may consider the "prior acts" evidence only to show the scope and nature of the conspiracy and not as showing that OCF is responsible for those prior acts.

■ Consistent with these views, we also hold that the trial court erred by giving plaintiffs' tendered instruction, which read, in relevant part: "[Instruction No. 31A:] *** Each conspirator is liable for all of the acts of each conspirator done in furtherance of the objects of the conspiracy committed before, or after, its entry into the conspiracy." Absent plaintiffs' proving that OCF knew and approved of its coconspirators' prior acts, this instruction did not accurately state the law.

## B. Judicial Notice

The material in this section is not to be published pursuant to Supreme Court Rule 23. 166 Ill. 2d R. 23.

## C. The Trial Court's Refusal To Allow Exhibits To Go to the Jury

OCF next argues the trial court erred when it "changed its mind about the admissibility" of three medical reports just prior to closing arguments. In response, plaintiffs argue that the court never reversed its ruling regarding the admissibility of the reports, but exercised its discretion by refusing to allow the exhibits to go to the jury during deliberations. We agree with plaintiffs.

■ Section 2—1107 of the Code of Civil Procedure (Code) provides that documents read or received into evidence "*may* be taken by the jury to the jury room for use during the jury's deliberation." (Emphasis added.) 735 ILCS 5/2—1107(d) (West 1994). The decision whether to send exhibits to the jury room is within the trial court's sound discretion, and a reviewing court will not disturb that decision absent an abuse of discretion that prejudices a party. *People v. Hudson*, 157 Ill. 2d 401, 439, 626 N.E.2d 161, 177 (1993).

Here, the trial court admitted into evidence three of OCF's exhibits: (1) a 1937 United States Public Health Service report; (2) a 1938 United States Public Health Service report; and (3) a 1955 article by a Saranac researcher. During the final jury instruction conference, the court declined "to submit those three documents to the jury." The record clearly shows the court did not—as OCF

contends—belatedly reverse its decision to admit the exhibits. Instead, the court simply exercised its discretion by refusing to send the documents to the jury room.

Thus, on remand, the trial court may, in its sound discretion, decline to submit these exhibits to the jury. However, the court should make clear to the parties that resolving what exhibits will go to the jury during deliberations is *not* the same as resolving what exhibits will be admitted into evidence. Just because the court has admitted an exhibit does not necessarily mean that it will go to the jury. The court should make clear that it will decide that issue after the court has ruled on the admissibility of the exhibits in question and prior to closing arguments (unless the court, in its discretion, makes that determination earlier in the proceedings).

### D. Form of OCF's Special Interrogatories

The material in this section is not to be published pursuant to Supreme Court Rule 23.

### E. Nonpattern Instruction on Damages

■ OCF next argues that the trial court erred by giving plaintiffs' tendered nonpattern instruction advising the jury that all damages awarded to the Van Winkles would have to be awarded to them in this action or not at all. We agree.

Plaintiffs Donald and Linda Van Winkle tendered the following instruction, asserting it was supported by the supreme court's holding in *Varelis v. Northwestern Memorial Hospital*, 167 Ill. 2d 449, 657 N.E.2d 997 (1995):

> "[Instruction No. 43:] If you find for the plaintiffs,. Don and Linda Van Winkle, on the question of liability, the damages which you award in this case are all of the damages which they or Don Van Winkle's survivors will be permitted to recover for the injuries which he has sustained. Even if the plaintiff, Don Van Winkle, dies from the injuries, the law precludes his survivors from recovering any further damages."

In *Varelis* (167 Ill. 2d at 460, 657 N.E.2d at 1002), the supreme court held that, under the Wrongful Death Act (Ill. Rev. Stat. 1987, ch. 70, pars. 1 through 2.2), an action for personal injuries brought during a decedent's lifetime will preclude a subsequent action for wrongful death premised on the same conduct. Although the statements tendered as instructions may be literally true, nowhere in *Varelis* does the above language appear. Further, Supreme Court Rule 239(a) provides that pattern jury instructions should be used whenever they accurately state the law applicable in a case. 134 Ill. 2d R. 239(a). A trial court may give nonpattern jury instructions *only* when the pat-

tern jury instruction on point does not adequately state the law. *Swartz v. Sears, Roebuck & Co.*, 264 Ill. App. 3d 254, 266, 636 N.E.2d 642, 650 (1993).

The pattern instructions actually given accurately stated the law governing damages awardable to Van Winkle if the jury found OCF liable for his injuries. We conclude that plaintiffs' nonpattern instruction No. 43 was unnecessary and *could be* viewed as advising the jury to compensate Van Winkle for *both* his lifetime damages and his wrongful death in the present action (though this action did not seek compensation for Van Winkle's wrongful death). Accordingly, we hold that the trial court erred by giving this nonpattern instruction.

### F. The Trial Court's Decision to Strike Mark Hicks' Punitive Damages Request

The material in this section is not to be published pursuant to Supreme Court Rule 23.

### G. Judgment *N.O.V.*

The material in this section is not to be published pursuant to Supreme Court Rule 23.

### V. CONCLUSION

For the reasons stated, we reverse and remand for a new trial consistent with the views expressed herein.

Reversed and remanded.

KNECHT, J., concurs.

JUSTICE McCULLOUGH, dissenting:

When a question comes from a deliberating jury, a trial judge is faced with a dilemma. Almost any response not agreed to by the litigants becomes fodder for an appeal. Any selective reading or highlighting of certain instructions violates a command contained in the instructions—do not single out an instruction.

Counsel may make tactical decisions in recommending the choice of language of an instruction or which parts of a pattern instruction should be given. They do so for the best interests of their client. The cooperation that occurs is not altruistic, but it is nonetheless cooperation. The goal is to come up with a legally correct set of instructions to inform and guide the jury. Courts of review frequently admonish appellants they cannot complain about an instruction unless an alternative instruction was offered. *Holder v. Caselton*, 275 Ill. App. 3d 950, 959, 657 N.E.2d 680, 688 (1995); *Kochan v. Owens-Corning Fiberglass Corp.*, 242 Ill. App. 3d 781, 800, 610 N.E.2d 683, 695 (1993).

When counsel and the trial judge confer on how to answer a jury question, they are conducting a mini instruction conference. In this case, OCF said both questions would be *easy* to answer yes. Plaintiffs' counsel objected to this suggestion and suggested the court respond that the instructions provided contain the applicable law. Neither suggestion was of much assistance to the trial judge.

If the answer was so easy and obvious, OCF could have proposed an instruction—*i.e.*, a suggested response—in writing. Neither at trial nor at oral argument on appeal did OCF's counsel suggest precisely what the response should have been.

OCF complains on appeal about the court's response to the jury questions. OCF provided no meaningful assistance to the trial court in framing an appropriate response, nor did the plaintiffs. However, it is OCF that contends it was disadvantaged when the trial court replied with an accurate, often-used and standard response.

Our supreme court has stated:

> "[A] trial court may exercise its discretion and properly decline to answer a jury's inquiries 'where the instructions are readily understandable and sufficiently explain the relevant law, where further instructions would serve no useful purpose or would potentially mislead the jury, when the jury's inquiry involves a question of fact, or if the giving of an answer would cause the court to express an opinion which would likely direct a verdict one way or another.' *Childs*, 159 Ill. 2d at 228[, 636 N.E.2d at 539]." *People v. McDonald*, 168 Ill. 2d 420, 460, 660 N.E.2d 832, 849-50 (1995).

The instructions previously given by the trial court correctly instructed the jury. The answer, given by the trial court, after conference with counsel, was not error.

With respect to the remand issues, I do not believe reversible error occurred and would affirm the judgment of the trial court.