DELORES McCLURE, Indiv. and as Special Adm'r of the Estate of Robert McClure, Deceased, Plaintiffs-Appellees, v. OWENS CORNING FIBERGLAS CORPORATION et al., Defendants-Appellants (Illinois Central Railroad Company, Defendant).—LOIS BICKNELL, Indiv. and as Special Adm'r of the Estate of Hugh Bicknell, Deceased, Plaintiffs-Appellees, v. OWENS CORNING FIBERGLAS CORPORATION, Defendant-Appellant, (Illinois Central Railroad Company, Defendant).—VERNADINE THACKER, Plaintiff-Appellee, v. OWENS CORNING FIBERGLAS CORPORATION, Defendant-Appellant.

Fourth District   Nos. 4—97—0424, 4—97—0458, 4—97—0459 cons.

Argued June 17, 1998.—Opinion filed August 11, 1998.

James R. Thompson, Bruce R. Braun (argued), and Gregory G. Volan, all of Winston & Strawn, of Chicago, and John L. Morel, of John L. Morel, P.C., of Bloomington, for appellant Owens Corning Fiberglas Corporation.

Joseph J. O'Hara, Jr., Catherine M. Masters (argued), and Matthew J. Fischer, all of Schiff, Hardin & Waite, of Chicago, for appellant Owens-Illinois, Inc.

James Walker and James R. Wylder (argued), both of James Walker, Ltd., of Bloomington, for appellees.

JUSTICE COOK delivered the opinion of the court:

The complaints in these consolidated cases alleged that defendants, Owens Corning Fiberglas Corporation (OCF) and Owens-Illinois, Inc. (OI), conspired with other asbestos manufacturers not to warn of the

health hazards of asbestos exposure, resulting in injury to asbestos workers who were not employed by either OCF or OI. The jury found OCF liable to plaintiff Lois Bicknell for the death of her husband, Hugh Bicknell, and awarded damages of $225,000; found OCF liable to plaintiff Vernadine Thacker and awarded damages of $200,000; and found OCF liable to plaintiff Delores McClure for the death of her husband, Robert McClure, and awarded damages of $400,000. OI was a defendant only in the McClure case, where the jury found OI equally liable with OCF. Defendants appeal. We affirm.

All three plaintiffs were exposed to asbestos at a plant in Bloomington, Illinois, owned by Union Asbestos and Rubber Company (Unarco). Hugh Bicknell worked at the plant from 1954-55, and Robert McClure from 1959-61. Vernadine Thacker was allegedly exposed to asbestos when it was brought into her home on the clothes of her husband and son, while they worked at the plant between 1952 and 1965. The Unarco plant manufactured various products using raw asbestos supplied by Johns-Manville Corporation. An industrial hygiene survey taken of the Unarco plant by OCF in 1970, when it purchased the plant, stated the atmospheric conditions of the plant were "unbelievably bad." While plaintiffs worked at the plant Unarco did not implement industrial hygiene practices, did not use effective dust collecting equipment, did not monitor the level of asbestos in the plant, and did not warn its employees of the potential hazards of asbestos.

From 1948 until 1958, OI manufactured a lightweight insulation product called Kaylo, which contained approximately 15% asbestos fibers. OI manufactured Kaylo at its plants in Berlin and Sayreville, New Jersey. Before it began production of Kaylo, OI commissioned the Saranac Laboratory (Saranac), an independent laboratory that had previously done testing for other asbestos manufacturers, to determine whether Kaylo would be a hazard to production workers or users or installers. Contrary to expectations it was discovered that Kaylo could cause asbestosis and Saranac suggested that "every precaution should be taken to minimize exposure of industrial employees." Saranac was allowed to publish its test results without any interference by OI, but OI did not place any warning labels on its Kaylo products. OI argues that it observed good industrial hygiene practices in its plants, with dust collection and monitoring systems, keeping the plants clean, using respirators in certain areas, and giving its employees annual physicals, including chest X rays.

OI testified it warned its employees. Richard Grimmie testified he was told on his first day of work at the Berlin plant that asbestos was dangerous to breathe, and he later gave the same warning to new

hires at the plant in his role as personnel manager. OI, however, could produce no written documents setting out its procedures for warning employees. Jerry Helser testified he was employed at the Berlin plant in the 1960s, after it was purchased by OCF, and he was never warned by OCF that asbestos could cause lung cancer or mesothelioma. OI and OCF employees have in fact contracted asbestos-related diseases.

OCF was formed in 1938 by several companies, one of which was OI. OCF began distributing Kaylo for OI in 1953, and in 1958 OCF purchased the Berlin plant from OI and began to manufacture Kaylo itself. At the time OCF purchased the plant, a dust study was performed that revealed concentrations as high as 91.8 million particles per cubic foot, conflicting with OI's assertion that it had followed good industrial hygiene practices at the plant. Defendants cite studies, accepted until approximately 1966, which concluded that keeping asbestos dust below a threshold limit value would prevent asbestos-related disease, but that threshold limit value was only 5 million particles per cubic foot. During the time it owned the Berlin plant (1958 to 1972), OCF did not warn its workers that asbestos could cause lung cancer or mesothelioma.

In 1970, OCF purchased the Unarco Plant in Bloomington. At that time the Unarco workers were being "severely exposed" to asbestos and the plant's ventilation was "totally inadequate." OCF argues that after it bought the plant, things changed, it instituted dust control, cleanup at the end of every shift, vacuum systems, respirators, X rays and company doctors. OCF continued to manufacture asbestos products at the former Unarco plant until 1972, but did not warn its employees of the risks of disease from exposure to asbestos until 1978. Defendants argue that the risks of asbestos were public knowledge before 1978, but the statement of the Secretary of the Department of Health and Human Services, Joseph Califano, warning of the health hazards of asbestos exposure, was not issued until April 1978.

It is undisputed that companies other than defendants engaged in a conspiracy to conceal the hazards of asbestos, beginning in the 1930s. Much of this evidence has been discussed in other cases. See, *e.g.*, *Van Winkle v. Owens-Corning Fiberglas Corp.*, 291 Ill. App. 3d 165, 168-70, 683 N.E.2d 985, 988-89 (1997); *Lohrmann v. Pittsburgh Corning Corp.*, 782 F.2d 1156 (4th Cir. 1986). In 1935 the general counsel of Johns-Manville convinced a researcher, Dr. A.J. Lanza, to downplay the dangers of asbestosis. That same year the editors of *Asbestos* magazine proposed a story on asbestosis, but the story was objected to by Raybestos and Johns-Manville executives and was never published. In 1936 a group of asbestos manufacturers, including Johns-Manville,

Raybestos, Unarco, and Abex, commissioned Saranac to conduct a study of asbestos, but they retained control over the study, and when Saranac's 1948 report showed findings of cancer and tumors those companies forced Saranac to remove the references before publication.

Among the items of evidence specifically connected to defendants are the following.

In 1941 OCF returned some published literature about asbestos to OI's industrial hygienist, Hazard.

A 1942 OCF internal memo proposed that OCF gather the "scores of publications in which the lung and skin hazards of asbestos are discussed" as a "weapon in reserve" for negotiating with the Asbestos Workers Union.

A 1956 advertisement and a 1959 brochure, bearing the names of both OCF and OI, stated that Kaylo was "non-toxic." OI asserts that it had no input into these documents.

In 1964, Johns-Manville advised OCF that it had decided to label certain products to indicate alleged health hazards of asbestos, and OCF questioned whether it should follow Johns-Manville's lead.

In 1968, the National Insulation Manufacturer's Association prepared a health and safety practices pamphlet for asbestos that made no mention of asbestosis, lung cancer, or mesothelioma. OCF and Johns-Manville employees helped draft that pamphlet.

In 1968, OCF participated in activities of the Insulation Industry Hygiene Council, and an internal OCF memo indicated that OCF's participation was to "limit the influence of Dr. Selikoff," who had been complaining of the hazards of asbestos.

A 1978 internal OCF memo indicated that OCF had contacted other companies, including OI, to determine how they would notify exposed workers in light of Secretary Califano's announcement. OI apparently did not respond.

In 1979, Johns-Manville called for a meeting of the asbestos companies to discuss "forces being brought to bear [which] raise serious questions as the viability of the industry." OCF attended the meeting, along with Unarco, Johns-Manville, Raybestos-Manhattan, and Abex. OI was invited but did not attend.

■ We first address plaintiffs' argument that OI failed to file a timely posttrial motion. OI sent its posttrial motion with a courier on the last day for filing but, due to a freak storm, the courier reached the courthouse after the clerk's office had closed. The timely filing of a posttrial motion stays the time for filing a notice of appeal and extends the time within which the trial court may act. *Beck v. Stepp*, 144 Ill. 2d 232, 238, 579 N.E.2d 824, 827 (1991); see 155 Ill. 2d R. 303(a)(1); 735 ILCS 5/2—1202(c) (West 1996). The trial court continued to have

complete jurisdiction over this case, even if OI's motion was filed late, because OCF's posttrial motion was pending. *Spurgeon v. Alton Memorial Hospital*, 285 Ill. App. 3d 703, 707, 674 N.E.2d 517, 520 (1996). Because OI's excuse was reasonable and plaintiffs would not have been prejudiced by the extension, it was an abuse of discretion for the court not to consider OI's posttrial motion. Plaintiffs now concede that OI's appeal is properly before us but assert that any issues not raised in a posttrial motion are waived. See 155 Ill. 2d R. 366(b)(2)(iii); 735 ILCS 5/2—1202(c) (West 1996). OI's issues were raised in a posttrial motion, they just were not ruled on. It would have been helpful to us if the trial court had addressed OI's motion, on the possibility that it had jurisdiction, and if plaintiffs had responded to the issues raised in OI's brief. We could remand this case for the trial court to rule on the posttrial motion. In the interests of judicial economy, however, we choose to address OI's issues.

Defendants argue that they are entitled to judgment *n.o.v.*, or in the alternative a new trial, because the evidence was insufficient to show defendants entered into any agreement. Defendants argue the evidence at most shows unilateral conduct on their part, and mere parallel conduct is insufficient to show a conspiracy. Defendants cite *In re Citric Acid Litigation*, 996 F. Supp. 951, 956 (N.D. Cal. 1998): "In an industry dominated by a few major players, parallel pricing, by itself, is generally insufficient to prove an antitrust conspiracy." *Citric Acid* indicates that this rule is a special rule that applies only in antitrust cases. In those antitrust cases where defendant's conduct is consistent with other plausible explanations, permitting an inference of conspiracy could pose a significant deterrent to beneficial procompetitive behavior. Although antitrust violations may sometimes be inferred from cutting prices, for example, cutting prices is often the very essence of competition. *Citric Acid*, 996 F. Supp. at 954-55. We decline to apply the rule of the antitrust cases to this case. Concealing the dangers of asbestos does not carry with it any beneficial aspects.

■ The other cases cited by defendants are similarly distinguishable. See *Intercontinental Parts, Inc. v. Caterpillar, Inc.*, 260 Ill. App. 3d 1085, 1094-95, 631 N.E.2d 1258, 1266 (1994) (manufacturer, who had right to set prices, allegedly involved in antitrust conspiracy with its dealers to increase prices); *Smith v. Eli Lilly & Co.*, 173 Ill. App. 3d 1, 27-28, 527 N.E.2d 333, 350 (1988) (rejecting concerted action theory of liability premised on allegations of joint submission of clinical data in applications for Food and Drug Administration approval of a drug), *rev'd on other grounds*, 137 Ill. 2d 222, 560 N.E.2d 324 (1990); In re Asbestos School Litigation, No. 83—0268 (E.D. Pa. December 16, 1991) (unreported case) (conspiracy count as to OCF dismissed although

concert of action count allowed to go to jury). If evidence of parallel conduct is sufficiently persuasive we see no reason why a jury could not rely upon it alone to find that a conspiracy existed. A conspiracy is rarely susceptible of direct proof; instead, it is established from circumstantial evidence and inferences drawn from evidence, coupled with commonsense knowledge of the behavior of persons in similar circumstances. *Adcock v. Brakegate, Ltd.*, 164 Ill. 2d 54, 66, 645 N.E.2d 888, 895 (1994). If two drivers leave the same day on a 10-day trip, stop for gas and food at the same places, spend nights in the same towns, and make the same side trips, that could be enough to show an agreement even though both individuals deny it.

■ In any event, plaintiffs do not rely solely upon parallel action to prove their cases. A defendant who understands the general objectives of the conspiratorial scheme, accepts them, and agrees, either explicitly or implicitly, to do its part to further those objectives is liable as a coconspirator. *Adcock*, 164 Ill. 2d at 64, 645 N.E.2d at 894. OCF certainly had contacts with others in the asbestos industry. OI left the business early, but there were ties between OI and OCF. OI argues that a 1953 agreement required OCF to place OI's trademark on all advertising and that the appearance of OI's name on the 1956 advertisement describing Kaylo as nontoxic was therefore as consistent with innocence as with guilt. We reject that argument. If it is true that OI in 1953 effectively bound itself to participate in future concealment of the hazards of asbestos, that is hardly a defense. Plaintiffs' counsel in closing argument stated that OI owned half of OCF and that Harold Boeschenstein served on both boards. Those arguments were not supported by the record, but the trial court overruled the objection and instructed the jurors to "recall the evidence they heard." OI was not prejudiced, however, because the evidence was clear that the relationship between OI and OCF was not an arm's-length relationship. OI did own stock in OCF at some point in time and, in the absence of evidence to the contrary, the jury could have found that ownership continued to exist at relevant later times.

The jury could have found that OI knew of the dangers of asbestos in the 1940s and addressed those dangers by providing respirators, ventilation, and other methods. The jury could have found that defendants' actions were reasonable, given the state of knowledge at the time they were taken, and that it is only in hindsight that defendants' actions can be criticized. The jury could have found that although OCF and OI knew that other manufacturers were concealing and failing to deal with the dangers of asbestos, that was not true of OCF and OI. In the alternative, the jury could have found that all manufacturers, including OCF and OI, were substantially aware of the

dangers of asbestos but chose not to disclose those dangers and put at risk the profits of the asbestos business. The jury could have found that it continued to be to OI's advantage, even after OI left the asbestos business, that the hazards of asbestos remain unknown to the general public. These questions were for the jury, and we cannot say the jury decided them incorrectly.

■ Relying on *Doe v. Noe*, 293 Ill. App. 3d 1099, 690 N.E.2d 1012 (1997), defendants argue that a conspiracy count should be dismissed where a defendant owes no "independent duty" to the plaintiff. In *Doe* the court dismissed a complaint against a doctor's medical partner and employer who were alleged to have conspired not to reveal the HIV (human immunodeficiency virus) status of the doctor, holding that the duty to disclose risks to a patient rests exclusively with the doctor in a physician-patient relationship and that no independent duty is imposed on others. Without addressing the merits of *Doe*, we see significant differences between that case and this. The doctor-patient relationship is not identical to the employer-employee relationship. No case has stated that the duty to disclose risks to asbestos workers rests exclusively with those workers' employers. The supreme court has specifically held that a conspiracy action may be stated against nonemployers in asbestos cases. *Adcock*, 164 Ill. 2d at 64-66, 645 N.E.2d at 894-95.

■ Defendants argue that the jury was improperly instructed that a late-joining conspirator is liable for all acts in furtherance of the conspiracy "committed before, or after its entry into the conspiracy," citing *Van Winkle*. Giving that instruction was held to be error in *Van Winkle*, and we reaffirm that holding. *Van Winkle*, 291 Ill. App. 3d at 175-76, 683 N.E.2d at 992-93 (a party who joins a preexisting civil conspiracy is liable for the prior tortious acts of its coconspirators only if it knew and approved of those acts). *Van Winkle* did not reverse on the basis of the instruction, however, and we hold that the giving of the instruction did not substantially prejudice defendants here.

*Van Winkle* held that evidence of acts committed before the defendant's entry into the conspiracy was admissible, even if the acts were committed without the defendant's knowledge and approval, to show the scope and nature of the conspiracy. *Van Winkle*, 291 Ill. App. 3d at 175-76, 683 N.E.2d at 993. It is difficult to separate acts admitted to show liability from acts admitted to show the scope and nature of a conspiracy. Defendants certainly should not be held specifically liable for the egregious actions of Unarco at the Bloomington plant, which may have resulted in injury before OCF bought the plant, without a showing that OCF knew and approved of those actions. The evidence in this case was more general, however. OI complains that

the instruction allowed the jury to find liability, without limitation, for acts which "included some of the most inflammatory evidence in the trial: efforts by [Johns-Manville] and Raybestos in the 1930's to suppress the results of research." That evidence would have come in anyway, under *Van Winkle*, to show the scope and nature of the conspiracy, and thereby the liability of defendants. Defendants were not prejudiced by the erroneous instruction. See 134 Ill. 2d R. 615(a). Defendants' proposed instruction, which simply deleted the words "before, or," was itself defective. *Van Winkle*, 291 Ill. App. 3d at 174-75, 683 N.E.2d at 992 (wrong to say late-joining conspirator never responsible for prior acts of coconspirators).

An important question is, when, if at all, did the defendants join the conspiracy? Were defendants in fact late-joining conspirators? Mere knowledge of what others are doing is not sufficient to create a conspiracy; there must be at least a tacit understanding to accomplish the unlawful purpose. There is ordinarily no duty to take affirmative steps to interfere, and mere presence at the commission of the wrong, or failure to object to it, is not enough to charge one with responsibility. W. Keeton, Prosser & Keeton on Torts § 46, at 323-24 (5th ed. 1984). It is for the jury to determine the point at which a party ceased being an observer and became a participant. In the present case the jury could have determined that OI became a participant in 1948, when it began production of Kaylo. The jury could have determined that OCF, which had ties to OI, became a participant at the same time. A company contemplating the manufacture of an asbestos product might become a conspirator before it actually began production. At the other end of the spectrum the jury could have concluded that OCF did not become a participant until 1970, when it acquired the Bloomington Unarco plant. OI, however, had to be a participant, if at all, at least since the 1940s.

The question may be asked, once a defendant is shown to have joined the conspiracy, is that defendant then liable to every plaintiff anywhere in the world who has contracted asbestosis? As to plaintiffs whose injury is complete when the defendant joins the conspiracy, the answer under *Van Winkle* seems to be no, that the late-joining defendant is only liable for the acts of other defendants when it knows and approves of those specific acts. It may be that conspiring defendants have broad liability to those who are injured in the future, but we need not decide the extent of that liability in this case. We do note there are direct connections between these plaintiffs and these defendants. OCF purchased the plant where these plaintiffs worked shortly after these plaintiffs worked there, and OCF had the opportunity to notify these plaintiffs of the dangers of asbestos. OI had

ties to OCF. This is not a case where the only connection between defendants and plaintiffs is that plaintiffs contracted asbestosis and defendants were a remote part of a conspiracy to conceal the dangers of asbestos.

■ Defendants complain that plaintiffs were not required to prove proximate cause by clear and convincing evidence. Because conspiracies are usually secret, plaintiffs are given considerable leeway to prove their existence by circumstantial evidence. To prevent abuse, plaintiffs are then required to prove the conspiracy by clear and convincing evidence. *Abell v. First National Bank*, 153 Ill. App. 3d 946, 948-49, 506 N.E.2d 684, 686 (1987). Once a conspiracy has been shown to exist, however, there is no justification to require proof by clear and convincing evidence that the conspiracy proximately caused plaintiffs' injuries. Whether plaintiffs' lung cancer was the result of cigarette smoking or inhalation of asbestos can usually be proved by direct evidence, and there is no reason to abandon the general rule that proximate cause must be established by a preponderance of the evidence.

■ Defendants argue the trial court erred in refusing to submit their special interrogatories to the jury. A trial court must submit a special interrogatory to the jury if it is in proper form. *Snyder v. Curran Township*, 281 Ill. App. 3d 56, 63, 666 N.E.2d 818, 823-24 (1996). A trial court need not submit a special interrogatory where it is repetitive, not readily understandable by the jury, or risks confusing or misleading the jury. *Snyder*, 281 Ill. App. 3d at 61, 666 N.E.2d at 822. Without setting out the proposed special interrogatories in detail, it does appear that they all suffered defects, and the trial court did not abuse its discretion in refusing to give them.

■ OI argues that Dr. Barry Castleman was improperly allowed to give his opinion that OI implicitly conspired with other asbestos manufacturers to suppress knowledge about the dangers of asbestos. Castleman has testified in other cases as a "state of the art" expert. See, *e.g., Skonberg v. Owens-Corning Fiberglas Corp.*, 215 Ill. App. 3d 735, 740, 576 N.E.2d 28, 31 (1991); *contra* Rutkowski v. Occidental Chemical Corp., No. 83—C—2339 (N.D. Ill. February 16, 1989) (unreported decision) (granting motion *in limine* to bar Castleman's testimony as an expert, observing he has no medical degree). An individual will generally be permitted to testify as an expert if his experience and qualifications afford him knowledge that is not common to laypersons and where such testimony will aid the trier of fact in reaching its conclusion. *People v. Enis*, 139 Ill. 2d 264, 288-89, 564 N.E.2d 1155, 1164-65 (1990) ("[w]e caution against the overuse of expert testimony"); *Watkins v. Schmitt*, 172 Ill. 2d 193, 204-07, 665 N.E.2d

1379, 1385-86 (1996) (expert reconstruction testimony). A witness may testify to the ultimate issue if he is qualified to testify and if that testimony would aid the jurors' understanding of the facts. *Wade v. City of Chicago Heights*, 295 Ill. App. 3d 873, 882, 693 N.E.2d 426, 432 (1998). We question whether Castleman's testimony was beyond the experience and knowledge of the jury. See *People v. Cloutier*, 156 Ill. 2d 483, 502, 622 N.E.2d 774, 784 (1993); Rutkowski, No. 83—C—2339 (N.D. Ill. February 16, 1989) (unreported decision). Nevertheless, we conclude that OI has not demonstrated that it was prejudiced by the admission of Castleman's opinion that OI was a member of the conspiracy. The jury understood that it was free to disregard Castleman's opinion.

■ OI complains that the deposition of its industrial hygienist, Willis Hazard, taken pursuant to Federal Rule of Civil Procedure 32 (28 U.S.C. app. Fed. R. Civ. P. 32 (1994)), should have been admitted. Hazard is now deceased. Plaintiffs were not parties to the action in which Hazard's deposition was taken. No one makes the argument that Hazard's deposition should not be admitted because it is more like a discovery deposition than an evidence deposition. Compare 134 Ill. 2d R. 212(a), with 134 Ill. 2d R. 212(b); see also *In re Estate of Rennick*, 181 Ill. 2d 395, 405, 692 N.E.2d 1150, 1155 (1998) (discovery deposition constituted an admission). Nor have the parties addressed whether this issue is controlled by Illinois or federal law. Rule 212(b) provides that evidence depositions may be used "by any party for any purpose" if the deponent is dead. 134 Ill. 2d R. 212(b). Rule 212(b) does not seem to address whom the evidence deposition may be used against. *Cf.* 28 U.S.C. app. Fed. R. Civ. P. 32(a) (1994) ("may be used against any party who was present or represented at the taking of the deposition or who had reasonable notice thereof").

If admissibility is not controlled by Rule 212(a) and the evidence deposition is simply considered to be former testimony, the rule seems to be that the two actions must involve " 'the same issue between the same parties or their privies' " (*George v. Moorhead*, 399 Ill. 497, 500, 78 N.E.2d 216, 218 (1948), quoting *London Guarantee & Accident Co. v. American Cereal Co.*, 251 Ill. 123, 131, 95 N.E. 1064, 1067 (1911)), and the matter in issue and the parties must be "essentially the same in both causes" (*George*, 399 Ill. at 501, 78 N.E.2d at 218). See also *People v. Doss*, 161 Ill. App. 3d 258, 265, 514 N.E.2d 502, 507 (1987). Federal Rule of Evidence 804(b)(1) (28 U.S.C. app. Fed. R. Evid. 804(b)(1) (1994)), which allows the admission of former testimony (including depositions) if the party against whom the testimony is now offered or "a predecessor in interest" had an opportunity and motive to cross-examine, has been interpreted to no longer require privity be-

tween the party against whom the evidence is offered and a party in the earlier case. *Horne v. Owens-Corning Fiberglas Corp.*, 4 F.3d 276, 282-83 (4th Cir. 1993) (Hazard depositions of February 11, 1981, and March 27, 1981, admitted); *Lohrmann*, 782 F.2d at 1160-61 (plant worker exposed to raw asbestos not a predecessor in interest of an installer of asbestos products).

Where the choice is between having testimony by way of deposition and having no testimony at all, it may be logical to allow the deposition testimony. See 134 Ill. 2d R. 212(b)(3) (if "exceptional circumstances exist which make it desirable, in the interest of justice" to allow the deposition to be used). On the other hand, abuses are possible, and the court must satisfy itself that the interests of the party against whom the deposition is sought to be admitted were protected by the presence of a party at the deposition with the opportunity and a similar motive to develop testimony. See *Wilkerson v. Pittsburgh Corning Corp.*, 276 Ill. App. 3d 1023, 1035-36, 659 N.E.2d 979, 987-88 (1995) (depositions of deceased employees properly excluded). Plaintiffs have not briefed this issue. It appears that Hazard's deposition should have been admitted in this case. Nevertheless, we cannot say that OI has been substantially prejudiced by exclusion of the deposition. It appears that OI was able to present much of the information contained in the deposition by other means.

■■■ OI argues that it should have been allowed to take the evidence deposition of plaintiffs' expert, Herbert Abrams, who stated at his discovery deposition that there was no evidence of conspiracy by OI. OI argues that "when it appeared close to trial that the plaintiff might not call Abrams to testify, OI noticed his evidence deposition, but the trial court quashed the notice." Again, plaintiffs have not briefed this issue. It does appear that OI should have been allowed to take Abrams' evidence deposition. *Ainsworth Corp. v. Cenco Inc.*, 158 Ill. App. 3d 639, 646-47, 511 N.E.2d 1149, 1153-54 (1987). Nevertheless, although Abrams' testimony would have been valuable to OI, we cannot say that OI was substantially prejudiced by not having it. Other witnesses testified that OI was not a party to the conspiracy.

■■■ Defendants argue the medical evidence was insufficient to show that asbestos exposure was the proximate cause of plaintiffs' injuries. Defendants argue that Bicknell and McClure had been heavy smokers and that it was unforeseeable that Thacker could have contracted asbestosis from household exposure to asbestos. There was conflicting evidence whether Bicknell's cancer originated in his lungs. There was conflicting evidence whether McClure died as a result of lung cancer or mesothelioma. The only medical evidence that Thacker had asbestosis was found in her medical records, which indicated that

clinicians had made that diagnosis. Nevertheless, each plaintiff managed to submit at least some reliable evidence that suggested asbestosis. The jury was entitled to place the weight it saw fit upon that evidence and to find plaintiffs' experts more credible than defendants' experts.

██ OI argues that it was entitled to an instruction on contributory negligence, asserting that McClure's smoking was the cause of his injury. Plaintiff argued in the trial court that conspiracy is an intentional tort, and a defendant's intentional conduct cannot be compared with a plaintiff's negligent conduct. We do not understand how McClure's conduct (working at the plant? smoking?) can be compared with OI's conduct in failing to disclose the dangers of asbestos. If McClure had been aware of the studies indicating that those with asbestosis are at an increased risk of lung cancer when they continue to smoke and McClure continued to smoke anyway, perhaps contributory negligence would have been an issue. See *Horne*, 4 F.3d at 279. There was no such evidence in this case.

██ Defendants argue they are entitled to setoffs under the Joint Tortfeasor Contribution Act (740 ILCS 100/2(c) (West 1996)), for plaintiffs' settlements with codefendants and other alleged coconspirators. Plaintiffs agree. We remand so that the trial court may order those setoffs.

We have considered all the remaining arguments of defendants and nevertheless conclude that the judgment of the trial court should be affirmed.

Affirmed and remanded.

KNECHT and GREEN, JJ., concur.