JERRY BURGESS, as Special Adm'r of the Estate of Delbert Burgess, Deceased, *et al.*, Plaintiffs-Appellees, v. ABEX CORPORATION, by its successor in interest, Pneumo Abex Corporation, Defendant-Appellant.— JERRY BURGESS, as Special Adm'r of the Estate of Delbert Burgess, Deceased, *et al.*, Plaintiffs-Appellees, v. ILLINOIS CENTRAL RAILROAD COMPANY *et al.*, Defendants (Pittsburgh Corning Corporation, Defendant-Appellant).

Fourth District   Nos. 4—98—0354, 4—98—0356 cons.

Argued April 21, 1999.—Opinion filed June 17, 1999.

Jerold S. Solovy, Donald R. Harris, and Barry Levenstam (argued), all of Jenner & Block, of Chicago, for appellant Abex Corporation.

Dennis J. Dobbels (argued) and Brian W. Fields, both of Polsinelli, White, Vardeman & Shalton, of Kansas City, Missouri, for appellant Pittsburgh Corning Corporation.

James Wylder (argued), of Walker & Wylder, Ltd., of Bloomington, for appellees.

JUSTICE COOK delivered the opinion of the court:

In these asbestos cases, the jury found for plaintiffs on a conspiracy theory. Defendants appeal. We affirm.

Delbert Burgess was employed as a security guard at the Union Asbestos & Rubber Company (Unarco) plant in Bloomington during 1953-54, briefly in 1961, and again during 1964-69. Burgess was diagnosed as having mesothelioma in early 1993, and he died June 18, 1993. Burgess' special administrator brought this action for wrongful death, and Francis Burgess, Burgess' wife, brought an action for injury to the husband-wife relationship and for the medical expenses of her husband. On February 4, 1998, the jury found for plaintiffs and assessed damages of $250,000 for losses sustained by Burgess during his lifetime, $600,000 for the wrongful death of Burgess, and $48,579 for losses sustained by Francis Burgess. Fault was assessed as 50% against defendant Abex Corporation (Abex) and 50% against defendant Pittsburgh Corning Corporation (PCC). Defendants were credited for plaintiffs' settlements with other companies prior to trial, which resulted in the satisfaction of Francis Burgess' judgment and reduction of the special administrator's judgment from $850,000 to $710,000.

Neither Abex nor PCC ever employed Burgess, and no evidence shows that any Abex or PCC product was ever used in the Unarco plant where Burgess worked. Plaintiffs' theory is that defendants and others, including Unarco, engaged in a conspiracy: (1) they agreed to positively assert that it was safe for people to work with asbestos, (2) they agreed to suppress information about the harmful effects of asbestos, (3) one or more of the conspirators performed an overt act in furtherance of the conspiracy, and (4) the agreement and acts in furtherance were a proximate cause of Burgess' death.

In *McClure v. Owens Corning Fiberglas Corp.*, 298 Ill. App. 3d 591, 698 N.E.2d 1111 (1998), *appeal allowed*, 181 Ill. 2d 574 (1998),

this court affirmed judgments entered against Owens Corning Fiberglas Corporation (OCF) and Owens-Illinois, Inc. (OI), on a conspiracy theory. We recited the following facts:

"It is undisputed that companies other than defendants engaged in a conspiracy to conceal the hazards of asbestos, beginning in the 1930s. Much of this evidence has been discussed in other cases. See, e.g., *Van Winkle v. Owens-Corning Fiberglas Corp.*, 291 Ill. App. 3d 165, 168-70, 683 N.E.2d 985, 988-89 (1997); *Lohrmann v. Pittsburgh Corning Corp.*, 782 F.2d 1156 (4th Cir. 1986). In 1935 the general counsel of Johns-Manville convinced a researcher, Dr. A.J. Lanza, to downplay the dangers of asbestosis. That same year the editors of *Asbestos* magazine proposed a story on asbestosis, but the story was objected to by Raybestos and Johns-Manville executives and was never published. In 1936 a group of asbestos manufacturers, including Johns-Manville, Raybestos, Unarco, and Abex, commissioned Saranac to conduct a study of asbestos, but they retained control over the study, and when Saranac's 1948 report showed findings of cancer and tumors those companies forced Saranac to remove the references before publication.

Among the items of evidence specifically connected to defendants are the following.

In 1941 OCF returned some published literature about asbestos to OI's industrial hygienist, Hazard.

A 1942 OCF internal memo proposed that OCF gather the 'scores of publications in which the lung and skin hazards of asbestos are discussed' as a 'weapon in reserve' for negotiating with the Asbestos Workers Union.

A 1956 advertisement and a 1959 brochure, bearing the names of both OCF and OI, stated that Kaylo was 'non-toxic.' OI asserts that it had no input into these documents.

In 1964, Johns-Manville advised OCF that it had decided to label certain products to indicate alleged health hazards of asbestos, and OCF questioned whether it should follow Johns-Manville's lead.

In 1968, the National Insulation Manufacturer's Association prepared a health and safety practices pamphlet for asbestos that made no mention of asbestosis, lung cancer, or mesothelioma. OCF and Johns-Manville employees helped draft that pamphlet.

In 1968, OCF participated in activities of the Insulation Industry Hygiene Council, and an internal OCF memo indicated that OCF's participation was to 'limit the influence of Dr. Selikoff,' who had been complaining of the hazards of asbestos.

A 1978 internal OCF memo indicated that OCF had contacted other companies, including OI, to determine how they would notify exposed workers in light of Secretary Califano's announcement. OI apparently did not respond.

In 1979, Johns-Manville called for a meeting of the asbestos companies to discuss 'forces being brought to bear [which] raise serious questions as the viability of the industry.' OCF attended the meeting, along with Unarco, Johns-Manville, Raybestos-Manhattan, and Abex. OI was invited but did not attend." *McClure*, 298 Ill. App. 3d at 595-96, 698 N.E.2d at 1114-15.

From the 1930s through the 1960s, Abex operated approximately 50 plants, 40 of which were foundries. Abex used asbestos in only four of its foundries, *i.e.*, to make brake linings for trucks and automobiles. Abex argues that none of its employees ever incurred an asbestos-related disease, but the evidence it presented for that argument was the testimony of its medical director's secretary between 1945 and 1986, who never recalled seeing any report that mentioned any asbestos-related disease in any employee.

Abex signed the November 20, 1936, agreement to underwrite certain experiments with asbestos dust at Saranac Lake. Abex received a copy of the 1948 report. Johns-Manville notified Abex of a meeting to discuss the report and that, if Abex could not attend, "it would be desirable for you to designate some representative of another company to act for you in connection with the decisions that will have to be made." Abex designated Vandiver Brown of Johns-Manville as its representative. Unarco attended the meeting. The notice also asked that the report be returned, as "it is obviously undesirable that the report in its present form receive any distribution of publicity outside a limited number of people in our respective organizations."

The report was reviewed by Abex's medical director, Dr. Lloyd Hamlin, who recognized that Johns-Manville was concerned with possible legal repercussions, although Hamlin could not see anything in the report that caused undue concern. Abex's executive vice president, W.T. Kelly, wrote Brown that Abex would like to retain its copy of the report, promising Brown "you may rest assured that the information contained therein will be treated as confidential." Brown replied it was the "unanimous opinion that reference to cancers and tumors should be deleted" from the report, and that all copies of the original report had been retrieved except Abex's. Brown again asked for Abex's copy. "Everyone felt it would be most unwise to have any copies of the draft report outstanding if the final report is to be different in any substantial respect." Kelly directed Dr. Hamlin to return the copy. Abex argues that no evidence shows that it in fact returned the copy and that, given Johns-Manville's legitimate reasons for not publishing parts of the report, returning the copy was certainly not unlawful.

Hamlin made speeches to health conferences in 1947 and 1948 in which he discussed the ability of asbestos to cause occupational fibrosis

or asbestosis, but Abex's employee publications made no reference to asbestosis, cancer, or industrial dust hazards, only tuberculosis. A report by Abex's medical department in 1952 mentioned a letter from Johns-Manville dated April 7, 1952, requesting "Dr. Hamlin's opinion with regard to informing employees of their chest [X-]ray findings." Abex complains that plaintiffs do not offer any evidence of Dr. Hamlin's response to this inquiry and that the letter discusses silica not asbestos. Abex circulated a memo in November 1964 containing the comments of Dr. Blackwell, one of Hamlin's successors, on the "asbestos/scare story," an article in the Journal of the American Medical Association entitled *Asbestos Exposure and Neoplasia*, written by Dr. Selikoff. It was suggested the memo might be helpful in the event an employee brought up the subject.

Burgess asserts that Abex attended the 1979 meeting called by Johns-Manville to discuss the "forces being brought to bear [which] raise serious questions as to the viability [visibility?] of the asbestos industry." Unarco attended that meeting. Abex responds no evidence shows it attended the meeting or that the participants discussed anything unlawful.

PCC manufactured the asbestos-containing product known as Unibestos from July 1962 to February 1972. Unibestos pipecovering and block had been the chief product at Unarco's Bloomington plant. PCC purchased the right to make Unibestos from Unarco and purchased Unibestos equipment from the Bloomington plant, which was placed into operation at a plant in Port Allegheny, Pennsylvania. PCC also purchased the Tyler, Texas, plant where Unarco had produced Unibestos and continued that production. One of Burgess' witnesses testified that the Tyler plant was notorious in its use of asbestos and was the subject of an exposé and a book, resulting in the closure and demolition of the plant.

PCC's parent company, Pittsburgh Plate Glass, supplied PCC with information on the hazards of asbestos prior to PCC's Unibestos start-up. Pittsburgh Plate Glass' medical director, Dr. Lee Grant, wrote PCC's Tyler manager in 1965 that precautions such as chest X rays needed to be taken to provide "medical-legal evidence important in preventing the development of unjust claims for asbestosis." In 1965, a PCC employee, Ron Francis, warned that asbestos was dangerous and that the Port Allegheny plant did not have adequate dust control. PCC declined to put further money into the plant. In 1968, PCC's employee, Roy Fuhs, reported that at a 1968 meeting in Biloxi, Mississippi, OCF and Johns-Manville brought the group up to date on what the National Insulation Manufacturer's Association (NIMA) was "doing to counteract some very adverse activity at the present time."

PCC states that the president of the Asbestos Workers Union was present at this meeting, as well as government officials. PCC seems to be referring to a New York meeting at which Dr. Selikoff spoke. Burgess belonged to the Textile Workers Union. Fuhs reported to a PCC vice president that the problem of health hazards among asbestos workers was becoming critical (30% of current asbestos workers had pulmonary problems) "and that a strong united front [was] necessary to preserve this industry."

In July 1968, PCC's Port Allegheny manager stated that NIMA members were using labels on their products and that PCC's lawyer in a case had recommended that PCC do so. The matter of labels was tabled by agreement until labor contract negotiations were settled at the Tyler plant. In November 1968, PCC began placing warning labels on Unibestos boxes, advising that the product contained asbestos and that users should avoid breathing any dust created by handling. If adequate ventilation was not possible, the user should wear an approved respirator. PCC's current senior vice president, Richard McPherson, agreed that label was "inadequate." PCC indicated it had satisfactory dust-control procedures in its plants in the mid-1960s, but surveys in October 1971 demonstrated grossly excessive fiber concentrations.

Burgess argues PCC attended the 1979 meeting called by Johns-Manville to discuss the "forces being brought to bear [which] raise serious questions as to the viability [visibility?] of the industry." Unarco also attended that meeting. PCC argues there is no evidence the purported meeting occurred or, if it did, that PCC actually attended, and there is no evidence of what was discussed at the purported meeting.

Both Abex and PCC point to the concern we expressed in *McClure*, that a defendant shown to have joined the conspiracy might be liable to every plaintiff anywhere in the world who has contracted asbestosis. In *McClure*, we concluded "direct connections between these plaintiffs and these defendants" existed. *McClure*, 298 Ill. App. 3d at 600-01, 698 N.E.2d at 1118. Burgess responds that direct connections exist between Burgess and PCC and Abex. PCC bought its plant in Tyler, Texas, and the Unibestos product line from Unarco. Burgess argues that, more than in any other recent appeal to this court, we have a conspirator in Abex which not only "tacitly" or "implicitly," but overtly and directly, agreed with other companies to suppress information. As in *McClure*, we remain uncertain where the line should be drawn, if at all, but we do see direct connections between these plaintiffs and these defendants. Abex and PCC were not remote parts of this conspiracy. PCC knew that Unarco's Unibestos workers were in danger, as were PCC's own Unibestos workers. There

was evidence that Abex and Unarco directly entered into an agreement to conceal the dangers of asbestos.

■ Abex and PCC argue the evidence was insufficient to show that they were a part of a conspiracy or that any conspiracy was the cause of Burgess' injuries. A defendant who understands the general objectives of the conspiratorial scheme, accepts them, and agrees, either explicitly or implicitly, to do its part to further those objectives is liable as a coconspirator. *Adcock v. Brakegate, Ltd.*, 164 Ill. 2d 54, 64, 645 N.E.2d 888, 894 (1994). The jury could have concluded that Abex directly agreed with Unarco and others to suppress information about the harmful effects of asbestos, beginning in the 1930s and continuing through the 1979 meeting called by Johns-Manville. Abex argues that its Dr. Hamlin was freely discussing the hazards of asbestos as early as 1947 and 1948, but the jury could have accepted Burgess' argument that Abex did not discuss this matter where it was really important— where it would come to the attention of Abex's employees and the employees of the other conspirators. The jury could have concluded that PCC, although a late entrant, was well aware of the dangers of asbestos and the activities of the other conspirators, including Unarco, from whom it purchased its Unibestos operation and its Tyler plant. PCC nevertheless exposed its own workers to grossly excessive fiber concentrations, chose to keep the workers of other employers in the dark for its own financial ends, and maintained the "strong united front" necessary to preserve the industry.

PCC argues that a party who joins a preexisting civil conspiracy is liable for the prior tortious acts of its coconspirators only if it knew and approved of those acts. *Van Winkle v. Owens-Corning Fiberglas Corp.*, 291 Ill. App. 3d 165, 175-76, 683 N.E.2d 985, 992-93 (1997). PCC argues it entered the asbestos field in July 1962 when it bought the Unibestos line from Unarco; therefore, (1) it could not be responsible for Burgess' exposure at the Unarco plant during 1953-54 and 1961; and (2) Burgess could not have been exposed to asbestos during 1964-69, after PCC bought Unarco's Unibestos line. There was evidence, however, that Unarco replaced Unibestos with another asbestos product, Unarcoboard. There was evidence that when OCF purchased the Bloomington Unarco plant in 1970, the atmospheric conditions at the plant were "unbelievably bad." PCC argued to the jury that the "vast majority" of Burgess' exposure at the Unarco plant had to have occurred from 1964 to 1969. The jury could have concluded that Burgess was exposed during the time PCC produced Unibestos.

■ Plaintiffs are required to prove the existence of a conspiracy by clear and convincing evidence. *McClure*, 298 Ill. App. 3d at 601, 698 N.E.2d at 1118; *Abell v. First National Bank*, 153 Ill. App. 3d 946, 948-

49, 506 N.E.2d 684, 686 (1987). Even where the burden is clear and convincing, however, we give deference to the decision of the trial court. The standard of review is whether the trial court's decision is against the manifest weight of the evidence. *J.F. Equipment, Inc. v. Owatonna Manufacturing Co.*, 143 Ill. App. 3d 208, 216, 494 N.E.2d 516, 521 (1986).

■ Abex cites *Regan v. Garfield Ridge Trust & Savings Bank*, 220 Ill. App. 3d 1078, 1091-92, 581 N.E.2d 759, 769 (1991), for the proposition that "if the circumstantial evidence is as consistent with nonconspiratorial conduct as it is with conspiratorial conduct, courts 'must find that the conspiracy was not proved.' " Actually *Regan* says that if the evidence is "as consistent with innocent conduct as guilty conduct, the court must find that the conspiracy was not proved." *Regan*, 220 Ill. App. 3d at 1092, 581 N.E.2d at 769. In antitrust cases, conduct that is beneficial and procompetitive, such as cutting prices, may in fact be shown to be the result of an illegal conspiracy. *McClure*, 298 Ill. App. 3d at 597, 698 N.E.2d at 1116. Concealing the dangers of asbestos, however, does not carry with it any socially beneficial aspects. *McClure*, 298 Ill. App. 3d at 597, 698 N.E.2d at 1116. That conduct cannot be seen as "innocent." *Cf. Regan*, 220 Ill. App. 3d at 1091-92, 581 N.E.2d at 769. PCC cites *In re Asbestos School Litigation*, 46 F.3d 1284, 1292-93 (3d Cir. 1994), quoting *Burnside v. Abbott Laboratories*, 351 Pa. Super. 264, 278, 505 A.2d 973, 980-81 (1985), for the proposition that the " 'mere fact that two or more persons, each with the right to do a thing, happen to do that thing at the same time is not by itself an actionable conspiracy.' " PCC had no right, however, to conceal the dangers of asbestos.

■ Abex cites the "innocent construction rule" of *Trowbridge Farm Supply Co. v. W.R. Grace & Co.*, 82 Ill. App. 3d 1140, 1146-47, 403 N.E.2d 311, 315-16 (1980). *Trowbridge* again was an antitrust case, where there was no evidence of "any knowledge of any conduct of others tending to unreasonably restrain trade." *Trowbridge*, 82 Ill. App. 3d at 1147, 403 N.E.2d at 316. In the present case, the jury could have concluded that when Abex's executive vice president directed Abex's medical director to return the single outstanding copy of the Saranac report containing references to cancers and tumors, that conduct was not innocent. *Trowbridge* does not stand for the proposition that the evidence of conspiracy must be incontrovertible.

■ Both Abex and PCC argue that mere parallel conduct cannot be a basis for liability. Parallel conduct is certainly admissible evidence. *Trowbridge*, 82 Ill. App. 3d at 1144-45, 403 N.E.2d at 314. In some cases parallel conduct may be very persuasive. *McClure*, 298 Ill. App. 3d at 597-98, 698 N.E.2d at 1116. This case involves much more than

parallel conduct. Direct evidence showed that Abex and PCC knew what the other manufacturers were doing, took steps not to interfere, and profited from continued production without disclosure to their employees.

■ Abex argues it was improper to allow Dr. Barry Castleman, with his degrees in chemical engineering, environmental engineering and pollution control, and doctorate of science in occupational and environmental health policy, to give his opinion that Abex was a member of a conspiracy. The trial court prohibited Castleman from using the word "conspiracy," but allowed him to give the opinion that Abex participated in a "common scheme" with other asbestos companies. Much of the testimony regarding the conduct of other companies came in through Castleman. Abex in fact cites portions of Castleman's testimony that are favorable to its argument. Asbestos cases are unique in that many of the same exhibits and witnesses have been presented over and over in perhaps hundreds of cases. Perhaps Castleman's testimony is a logical way to summarize voluminous records. See M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 1006.1 (6th ed. 1994). Castleman may have a knowledge of the historical facts that the jurors could never have had, and a special ability to analyze those facts, in light of his special training. We cannot say that the trial court abused its discretion in permitting the limited opinions from Castleman that it did.

Abex argues error occurred when (1) Burgess suggested no explanation was given regarding what had happened to the X rays Abex had taken of its employees, (2) the trial court gave a "missing evidence" instruction (Illinois Pattern Jury Instructions, Civil, No. 5.01 (3d ed. 1995)), and (3) Burgess was allowed to suggest in closing argument that Abex had put its old files "through a shredder." Judges in civil cases should be reluctant to give a missing witness instruction unless the witness is truly accessible only to one party. Cases should be decided on the basis of the evidence presented, not by bickering over who is to blame for supposed evidence not presented. If a party is compelled to call all possible witnesses to avoid the missing witness instruction, cumulative testimony and unduly lengthy trials will be the result. See *People v. Woods*, 292 Ill. App. 3d 172, 179-80, 684 N.E.2d 1053, 1059 (1997) (Cook, J., dissenting).

In the present case, Abex presented evidence that none of its employees ever incurred an asbestos-related disease, but the evidence it presented was the testimony of a secretary who said she did not recall ever seeing any reports of such disease. Abex had taken X rays of its employees. Why did Abex not have someone examine those X rays and testify no asbestos-related diseases were present? Abex said that it

produced all the documents and information Burgess requested during discovery and annual reports of its medical department, including summaries of the findings from Abex's chest X-ray program. Burgess never sought any individual X rays, although Abex does not say whether those X rays were available. It is suspicious that Abex did not support its affirmative statement, *i.e.*, that none of its employees ever had an asbestos-related disease, with better evidence. The X-ray evidence was certainly more accessible to Abex than it was to Burgess. The trial court did not abuse its discretion in giving the missing witness instruction. *Johnson v. Owens-Corning Fiberglas Corp.*, 233 Ill. App. 3d 425, 436, 599 N.E.2d 129, 136 (1992).

It is striking how many times Abex and PCC argue there is insufficient evidence to show that they did things they appear to have done, without themselves presenting evidence they did not do those things. Abex argues there is no evidence to show that it returned the copy of the Saranac report, that there is no evidence of Dr. Hamlin's response to the April 7, 1952, Johns-Manville letter. Abex and PCC argue there is no evidence they attended the 1979 meeting called by Johns-Manville. The jury could have concluded that Abex and PCC had no record of these events, that whatever records had been generated of these events had been discarded long ago as a part of a routine program for cleaning out files; on the other hand, the jury could have concluded that Abex and PCC would have made a greater effort to retain these documents—had they been beneficial to them—after the asbestos crisis took center stage in the 1970s.

Abex (previously known as the American Brake Shoe Company and as American Brakeblok) lawfully dissolved in August 1990 and was succeeded by Pneumo Abex Corporation (Pneumo Abex), which assumed Abex's liabilities. Abex complains that the trial court allowed Burgess to call Pneumo Abex's president, vice president, corporate counsel, and a former Abex president. Abex argues that Burgess had the burden of demonstrating "good cause" for requiring nonresident personnel of a corporate defendant to appear as witnesses at trial under Supreme Court Rule 237 (166 Ill. 2d R. 237). Abex argues these witnesses could only answer "I don't know," to many questions, putting Abex in a bad light, and that Burgess was allowed to suggest that Abex was seeking to avoid liability through complex corporate restructurings and machinations. PCC likewise complains that Burgess was allowed to call its employees, Richard McPherson and Randolph Gerrish. Burgess responds that PCC had supplied McPherson with information about its use of asbestos and Unibestos as a part of his employment, and had called McPherson as its witness in previous asbestos trials. Gerrish, a physicist, testified that he had tested Unibestos for

PCC but was not aware of any testing of Unibestos for health effects. We cannot say that the trial court abused its discretion in allowing these witnesses to be called.

Abex argues that (1) plaintiffs failed to prove that acts in furtherance of the alleged conspiracy caused Burgess' death or the alleged coconspirators committed tortious or unlawful acts in furtherance of the conspiracy, (2) the court failed to give necessary instructions, (3) testimony from other trials was improperly admitted, (4) unauthenticated documents were admitted, and (5) it should have been allowed to submit additional special interrogatories. PCC also complains of the instructions that were given, that some evidence was excluded, and that some evidence was improperly admitted. Many of these questions were considered in *McClure*, and we stand by our rulings there. We have considered all the remaining arguments of defendants and nevertheless conclude that the judgment of the trial court should be affirmed.

Affirmed.

GARMAN and MYERSCOUGH, JJ., concur.